UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Hon. Joseph H. Rodriguez |
| v. | Civil Action No. 07-1275 |
| SENSIENT COLORS, INC., | **MEMORANDUM OPINION & ORDER** |
| Defendant. | |

This matter is before the Court on a motion by Defendant Sensient Colors, Inc. ("Sensient") to dismiss the Complaint of Plaintiff United States of America ("United States") pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim. For the reasons expressed below, Defendant's motion will be denied.

## FACTUAL BACKGROUND

According to the Complaint, from approximately 1922 to 1988, in Camden, New Jersey, Defendant owned a six acre site (the "Site") on which it operated a facility which manufactured inorganic and organic pigments and dyes. (Complaint ¶¶ 6, 8.) During those years, Defendant disposed on the Site hazardous substances, as defined by Section 101(14) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601(14).[1] (Id. at ¶ 9.)

---

[1] CERCLA defines a hazardous substance as:
    (A) any substance designed pursuant to section 1321(b)(2)(A) of Title 33,
    (B) any element, compound, mixture, solution, or substance designated pursuant to section 9602 of this title,
    (C) any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act . . .
    (D) any toxic pollutant listed under section 1317(a) of Title 33,
    (E) any hazardous air pollutant listed under section 112 of the Clean Air Act, and

Beginning in March 1988, the United States Environmental Protection Agency ("EPA") initiated investigations at the Site. (Id. at ¶ 11.) The investigations revealed thousands of tanks, vats, drums, cylinders, and other containers. (Id.) Hazardous substances as defined by Section 101(14) of CERCLA existed at the Site. (Id.) These hazardous substances included benzene, diethylamine, sodium perchlorate, xylene, toluene, mercury, aniline, and hydrolic acid. (Id.) Many of these hazardous substances were acutely toxic, chronically toxic, poisonous, corrosive, flammable, shock-sensitive, and ignitable. (Id.)

During the EPA's initial investigations, the Site was unsecured, and trespassed upon by children and adults. (Id. at ¶ 15.) Children from the nearby Pleasant Gardens housing development utilized the Site as a playground and were observed playing in contaminated areas and making contact with contaminated materials. (Id.)

From approximately April 1998 to July 1998, the EPA conducted removal activities, including securing the Site and detonating or removing highly reactive and shock-sensitive hazardous substances at the Site. (Id. at ¶ 12.) From approximately September 1998 to December 1999, the EPA conducted further removal activities, including securing the Site, stabilizing, removing, and disposing of (off-Site) thousands of drums, bags, and small containers of hazardous substances, as well as sampling dust containing lead, chromium, and cadmium from the floors of the buildings at the Site, and decontaminating Site buildings. (Id. at ¶ 13.)

---

>   (F) any imminently hazardous chemical substance or mixture with respect to which the Adminsitrator has taken action pursuant to section 2606 of Title 15.

42 U.S.C. § 9601(14).

In October 1998 and August 1999, the EPA conducted investigations at the Site, including detailed screening of surface soils there, and found elevated levels of lead and other hazardous substances. (Id. at ¶ 14.) In March 2000, the Agency for Toxic Substances and Disease Registry issued a health consult for the Site. (Id. at ¶ 16.) The health consult concluded that because the existence of lead in the soil at the Site exposed children and adults to unacceptable levels of lead, the cleanup level adopted by the EPA was protective of public health. (Id.)

In approximately November and December of 2001, the EPA excavated the upper one foot of soil from areas of known surface soil contamination at the Site. (Id. at ¶ 17.) The excavation uncovered dye and pigment waste, stained soil, and burned hydrocarbon sludge and coal tar. (Id.) Post-excavation sampling and screening indicated that the extent of hazardous substances in soils at the Site was greater than previously known, and included lead, chromium, cadmium, mercury, benzo(a)pyrene, and other polynuclear (a/k/a polycyclic) aromatic hydrocarbons. (Id.) The Toxicity Characteristic Leaching Procedure analysis revealed that lead was leaching at concentrations exceeding the regulatory limit for hazardous waste. (Id.)

This leachable lead was threatening the contamination of groundwater in an aquifer used as a source of drinking water for local New Jersey communities. (Id.) Groundwater from the Site flows into the Potomac-Raritan Magothy aquifer, which is designated a sole-source aquifer, and could have created a significant hazard to public health if contaminated, since it is the sole drinking water source for the area. (Id. at ¶ 18.)

From March 2002 until December 2006, the EPA performed soil removal activities at the Site, including mitigating the public's direct and contact exposure with hazardous substances in the soil, and mitigating the threat of contamination of New Jersey drinking water. (Id. at ¶ 19.) During this time, the EPA conducted subsurface investigations at the Site, which revealed a greater than realized extent of soil contamination. (Id.)

Accordingly, the EPA expanded its removal activities at the Site. Those removal activities included: consolidation of contaminated soil from previous excavations; clearing and grubbing; demolition of various structures, including a garage, sheds, concrete pads, slabs and foundations, paved surfaces, timber pilings, and above-ground and below-ground tanks and vaults; removal and replacement of sewer pipe; installation of dewatering trenches and sumps; excavation of contaminated surface and subsurface soil; study and selection of on-site treatment technologies; stockpiling and on-site treatment of excavated soil; transportation and off-site disposal of treated soil; pre and post-excavation investigations, including sampling and screening; additional excavation necessary to meet cleanup criteria; backfilling with imported clean soil; installation of high density polyethylene liners between areas of clean backfill and contaminated soils; decontamination of paved surfaces and a building; revegitation, and reconstruction of wetlands, including installation of a drainage structure, grading, soil preparation, planting, and seeding. (Id. at ¶ 20.)

The EPA removed approximately 125,094 tons of contaminated soil from the Site. (Id. at ¶ 21.) In cleaning up the Site, the United States incurred over sixteen million dollars in response costs, within the meaning of Section 101(25) of CERCLA, 42 U.S.C. §

9601(25).² (Id.) In June 2004, the United States sent to the Defendant a notice of potential liability and demand for reimbursement of response costs in connection with the Site. (Id. at ¶ 23.) As of March 16, 2007, the United States had not received any reimbursement from Defendant. (Id. at ¶ 24.)

## PROCEDURAL BACKGROUND

On March 16, 2007, pursuant to CERCLA, 42 U.S.C. § 9607(a), the United States filed a Complaint against Defendant in this Court, seeking (1) reimbursement for all response costs associated with the Site, plus interest, and (2) declaratory judgment on Defendant's liability for future response costs, plus interest. On May 21, 2007, Defendant filed the instant motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).

## DISCUSSION

**A. Standard for 12(b)(6) Motion**

A Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief may be granted must be denied "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). A district court must accept any and all reasonable inferences derived from those facts. Glenside West Corp. v. Exxon Co., U.S.A., Div. of Exxon Corp., 761 F. Supp. 1100, 1107 (D.N.J. 1991). Further, the court must view all allegations in the complaint in the light most favorable to the plaintiff. See Scheuer, 416 U.S. at 236; Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994).

---

²CERCLA defines response as "remove, removal, remedy, and remedial action" and "enforcement activities related thereto." 42 U.S.C. § 9601(25).

It is not necessary for the movant to plead evidence, nor plead the facts that serve as the basis for the claim. Bogosian v. Gulf Oil Corp., 561 F.2d 434, 446 (3d Cir. 1977). The question before the court is not whether movants will ultimately prevail; rather, it is whether they can prove any set of facts in support of their claims that would entitle them to relief. Hishon v. King & Spalding, 467 U.S. 69, 73 (1984). Therefore, in deciding a motion to dismiss, a court should look to the face of the pleadings, take all of the allegations of fact as true and construe them in a light most favorable to the non-movant, and decide whether the allegations state a legal claim. Markowitz v. Northeast Land Co., 906 F.2d 100, 103 (3d Cir. 1990). Only the allegations in the complaint, matters of public record, orders, and exhibits attached to the complaint are taken into consideration. Chester County Intermediate Unit v. Pennsylvania Blue Shield, 896 F.2d 808, 812 (3d Cir. 1990).

**B. Whether United States' Complaint Against Sensient Should be Dismissed Pursuant to Fed. R. Civ. P 12(b)(6)**

Sensient's motion to dismiss the United States' Complaint for failure to state a claim will not be granted. To establish a prima facie case for liability under CERCLA, a plaintiff must allege that: (1) the defendant falls within one of four categories of responsible parties;[3] (2) defendant disposed of hazardous substances at a facility;[4] (3)

---

[3]Responsible parties include:
    (1) the owner and operator of a vessel or facility,
    (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of . . . .
42 U.S.C. § 9607(a).

[4]See footnote 1, above, for definition of hazardous substance under CERCLA.

there was a release or threatened release of hazardous substances from the facility into the environment, and (4) the release of the hazardous substance caused the plaintiff to incur response costs.[5]  United States v. Alcan Aluminum Corp., 964 F.2d 252, 258-59 (3d Cir. 1992).  While CERCLA allows the nature of a plaintiff's response to be either removal[6] or remedial,[7] Sensient argues that the United States' Complaint must be dismissed for failure to state a claim because (1) the EPA's response was remedial, not removal as the United States contends, and remedial actions may only be undertaken if they are listed on the National Priorities List,[8] and (2) even if the response by the EPA was removal, the United States is not entitled to recover on a removal action that exceeds CERCLA's twelve month and $2,000,000 statutory limits,[9] and (3) the United

---

[5]See note 2 for definition of response under CERCLA.

[6]Removal is:
[T]he cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release . . . .

[7]Remedial is:
[T]hose actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment . . . .

[8]The EPA may only undertake remedial actions that are listed on the National Priorities List.  40 C.F.R. § 300.425(b)(1).

[9]CERCLA limits responses to twelve months in duration or $2,000,000 in costs unless:


States' claims are barred by the three year statute of limitations for removal responses.[10] The United States has alleged the four elements necessary for a prima facie case for CERCLA liability, however. (See Complaint at ¶ 26-30.) Therefore, under the 12(b)(6) standard, Sensient's motion to dismiss will not be granted.

### 1. Whether the Complaint Establishes as a Matter of Law what Actions at the Site Were Remedial

The Complaint does not establish as a matter of law that actions undertaken by the EPA at the Site were remedial in nature. While Sensient may be correct in its argument that classifying a response as removal or remedial is a matter of law, it does not follow that this classification must be made at the pleadings stage. In fact, given the overlap between the two terms, as well as the fact-heavy nature of response classification, it would be antithetical to make such a determination at the pleadings stage.

Distinguishing a remedial response from a removal response can be difficult

---

(A) the President finds that
    (i) continued response actions are immediately required to prevent, limit or mitigate an emergency,
    (ii) there is an immediate risk to public health or welfare or the environment, and
    (iii) such assistance will not otherwise be provided on a timely basis, or
(B) the President has determined the appropriate remedial actions pursuant to paragraph (2) of this subsection and the State or States in which the source of the release is located have complied with the requirements of paragraph (3) of this subsection, or
(C) continued response action is otherwise appropriate and consistent with the remedial action to be taken . . . .
42 U.S.C. § 9604(c)(1).

[10]An action for recovery of costs for removal responses must be brought within three years of the completion of the removal. 42 U.S.C. § 9613(g)(2)(a).

given the lack of clarity with which these terms were defined in CERCLA. Interestingly, while Sensient cites United States v. Grace for the proposition that classifying a response as either removal or remedial is a matter of statutory interpretation for the court, it ignores that the case goes on to point out that in enacting CERCLA, "Congress did not draw a clear line between removal and remedial actions," therefore making attempts "to untie the Gordian knot of these definitions solely based on their plain meanings" unavailing. 429 F.3d 1224, 1241, 1239 (9th Cir. 2005). In glossing over the substantial discussion of statutory interpretation in Grace, Sensient fails to acknowledge one of the court's important conclusions: that it was "unable to discern Congress's clear intent through the normal tools of statutory interpretation" since "the meanings of 'removal' and 'remedial action' under CERCLA are inescapably vague." Id. at 1241.

Other courts have concluded similarly that the terms removal and remedial as defined under CERCLA are confusing. See, e.g., Geraghty & Miller, Inc. v. Conoco, Inc., 234 F.3d 917, 926 (5th Cir. 2000) ("[T]he CERCLA definitions [of removal and remedial] are expansive enough that certain activities may well be covered by both. This is a question of law with some complexity"); Public Serv. Co. v. Gates Rubber Co., 175 F.3d 1177, 1182 (10th Cir. 1999) ("Elements of either response action may overlap and semantics often obscure the actual nature of the cleanup performed"); General Elec. Co. v. Litton Indus. Automation, 920 F.2d 1415, 1419 (8th Cir. 1990) (holding that an excavation that totally and permanently cleaned up a hazardous waste site need not be restricted to the remedial realm) (abrogated on other grounds by Key Tronic Corp. v. U.S., 511 U.S. 809 (1994)). Thus, given the nuances that separate the terms removal and remedial under CERCLA, it would be impracticable for a court to classify a response before a factual record is developed.

Moreover, making a determination as a matter of law does not require a court to dispose of a case at the pleadings stage, which is what Sensient seems to suggest this Court should do. Indeed, in all cases cited by Sensient for the proposition that classifying a response is a matter of law, the courts made their determinations at the summary judgment stage, after a factual record had been developed. For example, in Grace, the court spent three pages reciting the history of the EPA response activities before it began to analyze whether the response was removal or remedial. 429 F.3d at 1229-1231. Likewise, in Geraghty, the court reviewed the relevant facts and the parties' arguments about how CERCLA law should be applied to the facts before it ruled the response there to be a removal. 234 F.3d at 926. The court in Geraghty also noted that classifying a response as removal or remedial is "highly fact-specific." Id. See also Carson Harbor Village, Ltd. v. Unocal Corp., 287 F. Supp. 2d 1118, 1157-58 (C.D. Cal. 2003) (holding that response classification is a matter of law to be decided on summary judgment, and relying on evidence in the record to support its remedial classification); Channel Master Satellite Sys., Inc. v. JFD Elecs. Corp., 748 F. Supp 373, 384-87 (E.D.N.C 1990) (holding that on the basis of the evidence before the court, the response was remedial, rather than removal); Hatco Corp. v. W.R. Grace & Co., 849 F. Supp. 931, 963 (D.N.J. 1994) (holding a response to be a removal based on the evidence in the record). Thus, the fact-specific nature of response classifications underscores the need for this Court to have access to a factual record before it classifies the EPA's response activities at the Site.

Additionally, Sensient's unequivocal definition of removal actions as interim responses to immediate threats and remedial actions as permanent responses is neither

accurate nor relevant to its motion to dismiss. Sensient is correct that courts have often classified interim or immediate responses as removals, and remedial responses as those involving long-term or permanent measures. See Alcan, 964 F.2d at 259 ("Typically, a 'removal' action is an action intended to remove the hazardous waste from the area, whereas a 'remedial' action involves a long-term effort to remedy the damaged environment"); Hatco, 849 F. Supp. at 961-62 ("Generally stated, removal actions are designed for short-term or interim cleanup measures, and remedial actions involve long-term or permanent measures."). These definitions, however, are not nearly as inflexible as Sensient implies. First, the fact that these definitions are prefaced by the terms "typically" and "generally" in the aforementioned cases underscores their flexibility. Moreover, in Hatco, the New Jersey District Court opined that "[a] response action may constitute both a removal and remedial action, and a court is not constrained to find either term applicable at the expense of the other." Id. at 962. The court in Hatco further elucidated the flexibility of the terms when it ruled that "CERCLA does not, by its terms, provide an exhaustive list of activities for either type of response." Id. at 963. Thus, Sensient's definitions of removal and remedial are inaccurate in their oversimplification.

Even if the definitions of removal and remedial were as inflexible as Sensient suggests, this Court fails to see the logical connection between Sensient's definitions of removal and remedial and its motion to dismiss. Specifically, this Court still would need a developed factual record before it could rule that the nature of the EPA's response at the Site was permanent, non-urgent and therefore remedial, as Sensient suggests. Moreover, under the 12(b)(6) standard, all of the United States' allegations of fact as set

forth in its Complaint must be accepted as true and construed in the light most favorable to United States, since it is the non-moving party.  <u>Markowitz</u>, 906 F.2d at 103.  Thus, under the 12(b)(6) standard, the United States' contention that the EPA's actions at the Site constituted removal must be accepted as true.

### 2. Whether the Complaint Should be Dismissed Because Removal Actions Are Subject to CERCLA's Twelve Month and $2,000,000 Statutory Limits

Assuming that the EPA's response was a removal action as the United States alleges in its Complaint, Sensient alternatively argues that the case should be dismissed because CERCLA subjects removals to twelve month and $2,000,000 statutory limits.  This contention by Sensient is an over-generalization of the law, and Sensient's motion to dismiss will not be granted on this ground.  As Sensient states in its brief, CERCLA prohibits recovery for removal actions exceeding twelve months in duration or $2,000,000 in amount.  42 U.S.C. § 9604(c)(1).  However, as the Ninth Circuit opined in <u>Grace</u>, "[t]hese limitations are not . . . inviolate."  429 F.3d at 1228.  The EPA may exceed this cap if one of the following exceptions applies:

> (i) There is an immediate risk to the public health or welfare of the United States or the environment; continued response actions are immediately required to prevent, limit, or mitigate an emergency; and such assistance will not otherwise be provided on a timely basis; or
> (ii) Continued response action is otherwise appropriate and consistent with the remedial action to be taken.

40 C.F.R. § 300.415(b)(5); <u>see also</u> 42 U.S.C. § 9604(c)(1).  Thus, CERCLA's statutory cap for removal actions is not a bright-line rule as Sensient suggests.

Given the exceptions to CERCLA's statutory cap that exist for removal actions, the United States' Complaint cannot be dismissed for failure to state a claim on the

12

grounds that the EPA's removal exceeded statutorily mandated limits. Under the 12(b)(6) standard, all of the United States' allegations of fact as set forth in its Complaint must be accepted as true and construed in the light most favorable to the United States as the non-moving party. <u>Markowitz</u>, 906 F.2d at 103. Moreover, under the liberal pleading standard of Fed. R. Civ. P. 8(a), parties are not required to plead specific evidence on which the claim is based, but rather a short and plain statement of the claim only. Thus, under the 12(b)(6) standard, the facts as the United States alleged them must be construed as falling into one of the categories warranting an exception to the statutory cap.

### 3. Whether the Complaint Should be Dismissed Because its Claims are Barred by the Statute of Limitations

Assuming that the EPA's response was a removal action as the United States alleges in its Complaint, Sensient alternatively argues that the case should be dismissed because removal actions under CERCLA are barred by a three-year statute of limitations. Under the liberal standard with which a court must view the non-moving party's pleadings with respect to a 12(b)(6) motion, this Court fails to see how the United States' Complaint is barred by the three years statute of limitations.

Sensient is correct that the government must initiate its case to recover for removal costs "within three years after the completion of the removal action." 42 U.S.C. § 9613(g)(2)(a). The United States alleges in its Complaint that the EPA's removal activities continued until December 2006. (Complaint at ¶ 10.) The United States subsequently filed its Complaint on March 16, 2007. (Docket Entry at 1.) Given that the United States filed its Complaint approximately three months after it alleges it ended its removal activities, this Court cannot dismiss for failure to state a claim on the ground that the statute of limitations has been exceeded.

## **CONCLUSION**

For the reasons stated above,

IT IS ORDERED on this <u>30th</u> day of October, 2007 that Defendant's motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) **[3]** is hereby **<u>DENIED</u>**.

<u>/S/ Joseph H. Rodriguez</u>
JOSEPH H. RODRIGUEZ
U.S.D.J.