FOR PUBLICATION

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

_____  
UNITED STATES OF AMERICA,      :  
                                    :  
               Plaintiff,     :  
                                    :    Hon. Joseph H. Rodriguez  
     v.                      :  
                                    :    Civil Action No. 07-1275  
SENSIENT COLORS, INC.,      :  
                                    :    OPINION  
             Defendant.   :  
                                    :  
_____ :

Appearances:

David L. Weigert, Esquire (Argued)  
Environmental Enforcement Section  
United States Department of Justice  
PO Box 7611  
Ben Franklin Station  
Washington, D.C. 20044

Frances Zizila, Esquire  
Lauren Fischer, Esquire  
Assistant Regional Counsel  
United States Environmental Protection Agency - Region 2  
290 Broadway  
New York, N.Y. 10007  
      Attorneys for Plaintiff

Michael A. Bogdonoff, Esquire (Argued)  
John M. Ix, Esquire  
Dechert LLP  
Princeton Pike Corporate Center  
PO Box 5218  
Princeton, N.J. 08543  
      Attorneys for Defendant

RODRIGUEZ, Senior District Judge:

This matter comes before the Court on the United States of America's ("the Government") motion to strike Defendant Sensient Colors' ("Sensient") affirmative defenses in this action brought under § 107(a) of the Comprehensive Environmental Response, Cleanup, and Liability Act ("CERCLA").  Oral argument was heard on July 17, 2008.  For the following reasons, as well as those placed on the record at oral argument, the Court grants in part and denies in part the Government's motion.

## I.  FACTUAL BACKGROUND

According to the Complaint, from approximately 1922 to 1988, in Camden, New Jersey, Sensient owned a six acre site (the "Site") on which it operated a facility which manufactured inorganic and organic pigments and dyes.  (Compl. ¶¶ 6, 8.)  During those years, Sensient allegedly disposed on the Site hazardous substances, as defined by § 101(14) of CERCLA, 42 U.S.C. § 9601(14).  (Id. ¶ 9.)

Beginning in March 1988, the United States Environmental Protection Agency (the "EPA") initiated investigations at the Site.  (Id. ¶ 11.)  The investigations revealed thousands of tanks, vats, drums, cylinders, and other containers.  (Id.)  Inside and around these containers, the EPA found numerous hazardous substances, including benzene, diethylamine, sodium perchlorate, xylene, toluene, mercury, aniline, and hydrolic acid.  (Id.)  Many of these hazardous substances were acutely toxic, chronically toxic, poisonous, corrosive, flammable, shock-sensitive, and ignitable.  (Id.)

-2-

During the EPA's initial investigations, the Site was unsecured, and trespassed upon by children and adults. (Id. ¶ 15.) Children from the nearby Pleasant Gardens housing development utilized the Site as a playground and were observed playing in contaminated areas and making contact with contaminated materials. (Id.)

From approximately April 1998 to July 1998, the EPA conducted removal activities, including securing the Site, and detonating or removing highly reactive and shock-sensitive hazardous substances. (Id. ¶ 12.) From approximately September 1998 to December 1999, the EPA conducted further removal activities, including securing the Site, stabilizing, removing, and disposing of (off-Site) thousands of drums, bags, and small containers of hazardous substances. (Id. ¶ 13.) It also sampled dust containing lead, chromium, and cadmium from the floors of the buildings at the Site, and decontaminated Site buildings during this period. (Id.)

In October 1998 and August 1999, the EPA conducted investigations at the Site, including detailed screening of surface soils there, and found elevated levels of lead and other hazardous substances. (Id. ¶ 14.) In March 2000, the Agency for Toxic Substances and Disease Registry issued a health consult for the Site. (Id. ¶ 16.) The health consult concluded that because the existence of lead in the soil at the Site exposed children and adults to unacceptable levels of lead, the cleanup level adopted by the EPA was protective of public health. (Id.)

In approximately November and December of 2001, the EPA excavated the upper

-3-

one foot of soil from areas of known surface soil contamination at the Site.  (Id. ¶ 17.)
The excavation uncovered dye and pigment waste, stained soil, and burned hydrocarbon
sludge and coal tar.  (Id.)  Post-excavation sampling and screening indicated that the
extent of hazardous substances in soils at the Site was greater than previously known, and
included lead, chromium, cadmium, mercury, benzo(a)pyrene, and other polynuclear
(a/k/a polycyclic) aromatic hydrocarbons.  (Id.)  The Toxicity Characteristic Leaching
Procedure analysis revealed that lead was leaching at concentrations exceeding the
regulatory limit for hazardous waste.  (Id.)

This leachable lead was threatening the contamination of groundwater in an
aquifer used as a source of drinking water for local New Jersey communities.  (Id.)
Groundwater from the Site flows into the Potomac-Raritan Magothy aquifer, which is
designated a sole-source aquifer.  (Id. ¶ 18.)  If this aquifer was contaminated, it could
have created a significant hazard to public health because it is the sole drinking water
source for the area.  (Id.)

From March 2002 until December 2006, the EPA performed soil removal activities
at the Site, including mitigating the public's direct and contact exposure with hazardous
substances in the soil, and mitigating the threat of contamination of New Jersey drinking
water.  (Id. ¶ 19.)  During this time, the EPA conducted subsurface investigations at the
Site, which revealed a greater than realized extent of soil contamination.  (Id.)
Accordingly, the EPA expanded its removal activities at the Site.  Those removal

activities included: consolidation of contaminated soil from previous excavations; clearing and grubbing; demolition of various structures, including a garage, sheds, concrete pads, slabs and foundations, paved surfaces, timber pilings, and above-ground and below-ground tanks and vaults; removal and replacement of sewer pipe; installation of dewatering trenches and sumps; excavation of contaminated surface and subsurface soil; study and selection of on-site treatment technologies; stockpiling and on-site treatment of excavated soil; transportation and off-site disposal of treated soil; pre and post-excavation investigations, including sampling and screening; additional excavation necessary to meet cleanup criteria; backfilling with imported clean soil; installation of high density polyethylene liners between areas of clean backfill and contaminated soils; decontamination of paved surfaces and a building; revegetation, and reconstruction of wetlands, including installation of a drainage structure, grading, soil preparation, planting, and seeding.  (Id. ¶ 20.)

The EPA removed approximately 125,094 tons of contaminated soil from the Site. (Id. ¶ 21.)  In cleaning up the Site, the Government incurred over sixteen million dollars in response costs, within the meaning of § 101(25) of CERCLA, 42 U.S.C. § 9601(25). (Id.)  In June 2004, the Government sent Sensient a notice of potential liability and demand for reimbursement of response costs in connection with the Site.  (Id. ¶ 23.)  As of March 16, 2007, the Government had not received any reimbursement from Sensient. (Id. ¶ 24.)

## II.  PROCEDURAL BACKGROUND

On March 16, 2007, pursuant to § 107(a) of CERCLA, 42 U.S.C. § 9607(a), the Government filed a Complaint against Sensient in this Court.  It seeks 1) reimbursement for all response costs associated with the Site, plus interest, and 2) declaratory judgment on Sensient's liability for future response costs, plus interest.  After unsuccessfully moving to dismiss the Complaint under Federal Rule 12(b)(6), Sensient filed its Answer on November 26, 2007.  Therein, Sensient primarily denied the allegations in the Government's Complaint.  It also asserted twelve affirmative defenses and a general reservation of future defenses.  On December 17, 2007, the Government filed its motion to strike to strike these affirmative defenses and the general reservation.[1]

## III.  DISCUSSION

### A.  Standard on a Motion to Strike

Federal Rule 12(f) permits a court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  FED. R. CIV. P. 12(f).  "'All well-pleaded facts are taken as admitted on a motion to strike but conclusions of law or of fact do not have to be treated in that fashion.  Matter outside the pleadings normally is not considered on a Rule 12(f) motion.'"  United States v. Kramer, 757 F. Supp. 397, 409 (D.N.J. 1991) (quoting 5A CHARLES ALAN WRIGHT & ARTHUR R.

---

[1]On July 29, 2008, Sensient filed an Amended Answer with the Government's consent. However, the affirmative defenses in the Amended Answer appear to be identical to those set out in the original Answer.  The Court therefore analyzes the Government's motion as if it had sought to strike the affirmative defenses in the Amended Answer.

MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 1380, 655-56 (1990)).

Generally, motions to strike are disfavored because of their dilatory character.  Id.
Additionally, courts are reluctant to grant such motions out of a concern that they often
involve a premature evaluation of a defense's merits, before the necessary factual
background is developed.  See id. at 410.  Nonetheless, a motion to strike will be granted
"where the insufficiency of the defense is clearly apparent."  United States v. Rohm &
Haas (Rohm & Haas II), 939 F. Supp. 1142, 1151 (D.N.J. 1996).  Under such
circumstances, motions to strike "serve a useful purpose by eliminating insufficient
defenses and saving the time and expense which would otherwise be spent in litigating
issues which would not affect the outcome of the case."  United States v. Marisol, Inc.,
725 F. Supp. 833, 836 (M.D. Pa. 1989).

## B.  CERCLA Statutory Overview

"Congress enacted CERCLA in December 1980 '[t]o provide for liability,
compensation, cleanup, and emergency response for hazardous substances released into
the environment and the cleanup of inactive hazardous waste disposal sites.'"  Kelley v.
Thomas Solvent Co., 714 F. Supp. 1439, 1445 (W.D. Mich. 1989) (quoting Pub. L. No.
96-510, Stat. 2767 (1980)).  The statute creates three possible courses of action for the
EPA to follow if a response action is needed at a given hazardous waste site:

> First, it may issue an administrative order directing the
> responsible party or parties to implement removal or remedial
> action.  Second, it may apply to the district court for an
> injunction to compel the responsible party or parties to abate an

> actual or threatened release of hazardous substances from a facility. Third, the EPA may undertake the removal or remedial action on its own and then sue the responsible party or parties for reimbursement.

United States v. Rohm & Haas (Rohm & Haas I), 669 F. Supp. 672, 674 (D.N.J. 1987) (citations omitted). In the present case, the EPA chose the last option.

Section 104 of CERCLA authorizes the EPA to take responsive action when there is a release or threatened release of hazardous substances into the environment. 42 U.S.C. § 9604. These response actions can involve the removal of the hazardous substances and/or remediation at the site. Either way, responsive measures are guided by the principles set forth in the National Contingency Plan ("NCP"), 40 C.F.R. §§ 300.1-300.1105. Among other things, the NCP describes methods of investigating the environmental and health problems associated with a release of hazardous substances, and provides criteria for determining the appropriate responsive measures.

EPA response actions conducted pursuant to § 104 of CERCLA are initially financed with federal Superfund[2] monies. The Government may recover its costs, however, in an action brought under § 107(a) of the statute.

To recover response costs under § 107(a), a plaintiff must establish four elements:

---

[2]The Superfund was formerly known as the "Hazardous Substance Response Trust Fund," and was originally established by § 221 of CERCLA, 42 U.S.C. § 9631 (repealed 1986). In 1986, however, Congress enacted the Superfund Amendments and Reauthorization Act ("SARA"), which, among other things, abolished the original fund. Its replacement, the "Hazardous Substances Superfund," was established pursuant to § 517 of SARA. The authorization for the Superfund is now codified at 26 U.S.C. § 9507.

1) the defendant falls within one of four statutory categories of responsible parties,[3] 2) the

hazardous substances are disposed at a "facility,"[4] 3) there was a "release,"[5] or threatened

release of hazardous substances from the facility, and 4) the release causes the incurrence

of "response" costs.[6]  E.g., United States v. Alcan Aluminum Corp., 964 F.2d 252, 258-59

---

[3]Under § 107(a), a responsible party includes "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of . . . ." 42 U.S.C. § 9607(a)(2). The Government alleges Sensient is a responsible party under this provision. (See Compl. ¶ 30.) Sensient denies this allegation. (See Am. Answer ¶ 30.)

[4]A facility is defined as:

> (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.

42 U.S.C. § 9601(9).

[5]Subject to certain exclusions not relevant here, a release is defined as:

> any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant) . . . .

42 U.S.C. § 9601(22).

[6]The terms "respond" and "response" mean "remove, removal, remedy, and remedial action[;] all such terms (including the terms 'removal' and 'remedial action') include enforcement actions related thereto." 42 U.S.C. § 9601(25). "Typically, a 'removal' action is an action intended to remove the hazardous waste from the area, whereas a 'remedial' action involves a long-term effort to remedy the damaged environment." United States v. Alcan Aluminum Corp., 964 F.2d 252, 259 n.10 (3d Cir. 1992). As a practical matter, however,

-9-

(3d Cir. 1992).  Parties liable under § 107(a) must pay "all costs of removal or remedial action incurred by the United States Government . . . not inconsistent with the national contingency plan . . . ."  42 U.S.C. § 9607(a)(4)(A).  Importantly, consistency with the NCP is presumed in actions brought by the Government under § 107(a).  United States v. E. I. Dupont De Nemours & Co., Inc., 432 F.3d 161, 178 (3d Cir. 2005).  The responsible party has the burden of rebutting this presumption by demonstrating that the Government's response action giving rise to its costs was inconsistent with the NCP.  Id.

　　　Central to CERCLA's liability scheme is the imposition of strict liability on responsible parties.  42 U.S.C. § 9601(32); Alcan Aluminum, 964 F.2d at 259.  Additionally, subject to a limited exception discussed in part III.C.3.,infra, liability under CERCLA is joint and several.  Kramer, 757 F. Supp. at 422.  Moreover, § 107(a) imposes liability "notwithstanding any other provision or rule of law, and subject only to the defenses set forth in [§ 107(b)]."  42 U.S.C. § 9607(a).  In turn, § 107(b) exempts from liability only those who

> can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by
>
> 　(1) an act of God;

---

determining whether a particular response is properly characterized as a removal action as opposed to a remedial action can be difficult and often necessitates development of the factual record.  See, e.g., United States v. Sensient Colors, Civil Action No. 07-1275, 2007 U.S. Dist. LEXIS 80126, at *13-14 (D.N.J. Oct. 30, 2007).

(2) an act of war;

(3) an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant . . . , if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions; or

(4) any combination of the foregoing paragraphs.

42 U.S.C. § 9607(b).  Significantly, § 107(b) provides the only substantive affirmative

defenses to liability in a § 107(a) cost recovery action.  See Rohm & Haas II, 939 F. Supp.

1142, (D.N.J. 1996) ("[T]his circuit has made it clear in its jurisprudence that non-§

107(b) defenses are not available to defeat CERCLA liability."); Kramer, 757 F. Supp. at

410 ("'[T]he only substantive defenses to liability under CERCLA are those found in

section 107(b).'" (quoting Kelley, 714 F. Supp. at 1445)).

### C.  Analysis of the Government's Motion

#### 1.  First Affirmative Defense–Statute of Limitations

Sensient's first affirmative defense maintains that the "EPA's causes of action are

barred in whole or in part by [the] applicable statute of limitations or statutes of repose,

including Section 113(g)(2) of [CERCLA], 42 U.S.C. § 9613(g)(2)."  (Am. Answer, p. 9.)

The Government acknowledged at oral argument that Sensient is permitted to raise a

-11-

statute of limitations defense in its Amended Answer.  (See Hearing Tr., 7/17/08, 27:24-28:2.)  But it takes issue with some of the language Sensient employed in drafting this particular defense.

Section 113(g)(2) of CERCLA provides the applicable limitations period for actions brought under § 107(a):  "An initial action for recovery of the costs referred to in section 107 . . . must be commenced . . . for a removal action, within 3 years after completion of the removal action . . . ."  42 U.S.C. § 9613(g)(2).  As with other kinds of civil litigation, defendants in CERCLA cost recovery actions frequently assert statute of limitations defenses in order to avoid liability.  See, e.g., United States v. Navistar Int'l Transp. Corp., 152 F.3d 702, 704 (7th Cir. 1998) (noting a defendant's argument that summary judgment was appropriate in a cost recovery action because the government's claims were barred by CERCLA's statute of limitations).  Further, the Federal Rules of Civil Procedure generally require a defendant to preserve a statute of limitations defense by pleading it as an affirmative defense in the answer to the complaint.  See FED. R. CIV. P. 8(c), 12(b).

The Government complains about three purported defects in the defense's language.  First, it argues that the defense is deficient because it bars only the EPA's causes of action when, in fact, the entirety of the Government brings this case.  This is a minor technical defect that the Court will ignore because "[p]leadings must be construed

so as to do justice."[7] FED. R. CIV. P. 8(e).  Justice is not served by requiring hyper-technical perfection with respect to a phrase that is unrelated to the substance of the defense.

Second, the Government doubts Sensient could properly assert that this action is barred "in whole" when the Complaint alleges it was commenced a mere three months after completion of the EPA's response activities at the Site.  The Government's argument is premised on the idea that an affirmative defense is "'[a] defendant's assertion raising new facts and arguments that, if true, will defeat the plaintiff's . . . claim, even if all allegations in the complaint are true.'"  Saks v. Franklin Covey, 316 F.3d 337, 350 (2d Cir. 2003) (quoting Black's Law Dictionary 430 (7th ed. 1999)).  In essence, the Government's position is that because it alleged this action is timely, Sensient cannot counter that it is untimely.  The problem with this argument is the ridiculous result to which it leads, namely that a defendant can be prevented from asserting such a defense simply by a plaintiff's *allegation* that the case is timely.  This has a practical implication in this case because Sensient denies that removal activities continued up to December 2006.  (Am. Answer ¶ 19.)  Instead, it appears to contend that the EPA's response shifted from removal action to remedial action some time during its eight-year presence at the Site.  (Sensient's Br., p. 22; see Am. Answer ¶ 19.)  If true, this could affect Sensient's

---

[7]Some of Sensient's other affirmative defenses refer only to the EPA's causes of action, rather than to the claims of the Government as a whole.  The Court will ignore these technical imperfections unless otherwise noted.

liability; suppose, for example, the removal activity ended in March 2002–five years

before this suit was filed–and what continued at the Site until December 2006 was really

remedial activity that was mischaracterized as removal.  In such a situation, the

Government's claim for reimbursement of the removal costs would ostensibly be time

barred by § 113(g)(2)(A) because the suit would not have been brought within three years

after the completion of the removal action.

　　　The Government's third objection to the first affirmative defense has to do with

the following italicized language: "EPA's causes of action are barred in whole or in part

by [the] applicable statute of limitations *or statutes of repose,* including Section 113(g)(2)

of [CERCLA], 42 U.S.C. § 9613(g)(2)."  The Government maintains that § 113(g)(2)

provides the only statute of limitations applicable in a CERCLA cost recovery action.  It

further asserts that Sensient's reference to unspecified statutes of repose is ambiguous,

and fails to satisfy the notice pleading requirements of Rule 8.  The Court agrees.  For this

reason, the first affirmative defense will be stricken, but Sensient is granted leave to

amend it.  In so doing, however, it either must expunge references to unspecified statutes

of limitations or repose, or else identify the statutes to which it refers.

　　　*2.  Second Affirmative Defense–Attribution of Costs to Sensient's Facility*

　　　Sensient's second affirmative defense asserts that "[i]n the event that Sensient is

found responsible for any of the response costs alleged in [the] Complaint and affirmative

relief is granted against Sensient, then such relief is limited to only those response costs

that are attributable to the 'facility' formerly owned or operated by Sensient." (Am. Answer, p. 9.) Sensient maintains that this defense is intended to limit the scope of the Government's recovery to only properly incurred response costs. At oral argument, it explained its belief that some of the EPA's work for which the Government seeks recovery was done to aid a nearby public transportation project, not to remove hazardous substances from the Site. (See Hearing Tr., 7/17/08, 56:22-57:6.) It argued that the second affirmative defense puts the Government on notice that it may not recover such costs. But this really speaks to whether the Government can prove its prima facie case, particularly that it incurred response costs and that Sensient is a responsible party. Sensient denies allegations to this effect in its Amended Answer. (See Am. Answer ¶¶ 26-28, 30.) The second affirmative defense merely recapitulates these denials. It is stricken for this reason. See FED. R. CIV. P. 12(f) (permitting the Court to strike any redundant matter).

### 3. Third Affirmative Defense–Divisibility of Harm

Sensient's third affirmative defense asserts that any relief granted against Sensient "should be proportionate to [its] contribution to the harm or endangerment. . . because there is a reasonable basis upon which to divide responsibility between Senient" and several other entities. (Am. Answer, p. 9.) The Government moves to strike this defense because it speaks to contribution, which is not a defense to joint and several liability under CERLCA. Sensient contends it merely asserted an inartful, but nonetheless

permissible, divisibility defense.  The Court agrees with the Government.

As noted, liability under CERCLA is generally joint and several.  <u>Kramer</u>, 757 F.

Supp. at 422.  Still, a responsible party can avoid the application of joint and several

liability by showing 1) that the harm is divisible and 2) that there is a reasonable basis for

apportioning the harm among the defendants.  <u>Id.</u>  Notably, divisibility is not among the

defenses listed in § 107(b).  This is because divisibility is not a defense to liability under

CERCLA.  <u>Rohm & Haas II</u>, 939 F. Supp. at 1154.  "Instead, it is a judicially crafted

allocation principle designed to remediate the harshness of joint and several liability

applied under CERCLA § 107(a) on those [responsible parties] who have contributed a

relatively lesser portion of hazardous substances to a CERCLA facility."  <u>Id.</u>  For this

reason, divisibility is recognized as a valid affirmative defense.  <u>Id.</u>

It is also important to understand that CERCLA features another mechanism to

remedy the potentially unfair burden imposed by joint and several liability.  Section 113

allows named defendants to seek contribution from other potentially responsible parties to

apportion response costs equitably.  It provides, in relevant part:

> Any person may seek contribution from any other person who
> is liable or potentially liable under section 107(a) . . . , during or
> following any civil action under . . . section 107(a) . . . .  In
> resolving contribution claims, the court may allocate response
> costs among liable parties using such equitable factors as the
> court determines are appropriate.

42 U.S.C. § 9613(f)(1).

Contribution under § 113(f)(1) and the divisibility defense are both intended to

-16-

serve a similar purpose–mitigation of the potentially harsh application of joint and several

liability.  Despite this similarity, these mechanisms are conceptually distinct and must not

be confused with one another:

> "There are two distinct contexts in which the issue of 'apportionment' arises.  It is critical that these two different contexts are not confused.  In the first context, the question is whether the harm resulting from two or more causes is indivisible, or whether the harm is capable of division or apportionment among separate causes.  If there is a single harm that is theoretically or practically indivisible, each defendant is jointly and severally liable for the entire injury.  However, if there are distinct harms that are capable of division, then liability should be apportioned according to the contribution of each defendant.
>
> The second context in which the issue of 'apportionment' arises occurs after the first inquiry regarding the indivisibility of the harm.  If the defendants are found to be jointly and severally liable, any defendant may seek to limit the amount of damages it would ultimately have to pay by seeking an order of contribution apportioning the damages among the defendants."
>
> Thus, this Court may conclude in the contribution action that [one defendant] has overpaid based on equitable factors and is entitled to contribution.  But the Court's discretion in allocating damages among the defendants during the contribution phase does not affect the defendants' liability.

United States v. Western Processing Co., 734 F.Supp. 930, 938 (W.D. Wa. 1990)

(quoting United States v. Stringfellow, 661 F.Supp. 1053, 1060 (C.D. Cal. 1987)).

Moreover, unlike the divisibility defense, remedies related to contribution under §

113(f)(1) are not available against the Government except through a counterclaim.  See

Rohm & Haas II, 939 F. Supp. at 1151. Sensient has not asserted such a claim in this

case.  Thus, its third affirmative defense can survive the motion to strike only if it

properly alleges the divisibility defense.

Typically, courts do not require defendants to plead divisibility with absolute precision.  It is not necessary for defendants to plead both prongs of the divisibility standard, i.e., that the harm is divisible *and* that it is reasonably apportioned.  See Kramer, 757 F. Supp. at 422-23 & n.36 (denying a motion to strike affirmative defenses that included phrases to the effect that a reasonable basis existed for apportioning the harm); Kelley, 714 F. Supp. at 1448-49 (declining to strike a defense that asserted the "plaintiff's damages can be apportioned").  On the other hand, courts will strike affirmative defenses that allege only issues of contribution.  See Kramer, 757 F. Supp. at 422-23 (striking defenses that asserted "liability should not be joint and several, but only proportionate to [the defendants'] contribution to the endangerment and costs at the Site").

Here, the wording of Sensient's third affirmative defense speaks to contribution, not divisibility of harm.  Sensient claims the extent of its liability "should be proportionate to [its] contribution to the harm or endangerment" at the Site.  (Am. Answer, p. 9.)  This is nearly identical to the language in the defenses the Kramer court ordered stricken.  Further, unlike the divisibility defenses in Kramer that were properly pleaded, Sensient's third affirmative defense does not actually allege any reasonable basis for apportioning the harm.  Instead, it merely claims that "responsibility" for the harm can be divided among several potentially responsible parties.  (Id.)  Tellingly, Sensient also

-18-

names these parties as third-party defendants in a contribution action brought under §
113(f). This further suggests the third affirmative defense speaks to contribution and
does not allege a viable divisibility defense. It therefore is stricken, but the Court grants
Sensient leave to properly amend the defense if it so chooses.

### 4.   Fourth Affirmative Defense–Recovery Limited to Response Costs

In the fourth affirmative defense, Sensient asserts the "EPA's claims are barred to
the extent [it] seeks to recover costs and expenses other than response costs . . . ."
(Answer, p. 10.) This defense is stricken for two alternative reasons. First, the
Complaint alleges only that the Government is entitled to recover response costs incurred
as a result of its action at the Site.[8]  (Compl. ¶¶ 22, 28.) In other words, there does not
appear to be any costs at issue in this case other than response costs, making the defense
immaterial. Second, if Sensient is alleging the Government incorrectly characterized
some of its costs as response costs, this defense merely recapitulates Sensient's denial of
the Government's allegation that it incurred only response costs. (See Am. Answer ¶ 28.)
Either way, the defense is stricken. See FED. R. CIV. P. 12(f) (permitting courts to strike
immaterial and redundant matters).

---

[8]While the Complaint's prayer for relief additionally requests the award of enforcement
costs, such costs are considered a part of response costs. See 42 U.S.C. § 9601(25).

5.  *Fifth Affirmative Defense–Inconsistency with the NCP,
Arbitrary and Capricious Action, Absence of Substantial
Evidence, and Failure to Meet Conditions Precedent*

Sensient's fifth affirmative defense alleges that the

> EPA's claims are barred to the extent that [it] seeks to recover
> [1] response costs that were, are, or will be inconsistent with the
> National Contingency Plan, or [2] result from arbitrary and
> capricious action, or [3] result from response actions that were
> not, are not, or will not be supported by substantial evidence, or
> [4] otherwise where EPA has failed to meet all conditions
> precedent to recovery.

(Am. Answer, p. 10.)  As discussed below, this defense will be stricken.

The first part of the fifth affirmative defense relates to inconsistency with the NCP.

Under § 107(a)(4)(A), a liable defendant must pay "all costs of removal or remedial

action incurred by the United States Government . . . not inconsistent with the national

contingency plan . . . ."  42 U.S.C. § 9607(a)(4)(A).  Stated another way, a defendant,

even if liable, need not reimburse the Government for the costs of a removal action that

was inconsistent with the NCP.

Many courts have recognized that a CERCLA defendant can plead inconsistency

with the NCP as an affirmative defense to the recoverability of particular costs.  See, e.g.,

United States v. Smuggler-Durant Mining Corp., 823 F. Supp. 873, 877 (D. Colo. 1993);

United States v. Pretty Products, Inc., 780 F. Supp. 1488, 1500 (S.D. Ohio 1991).

Nonetheless, the first clause of the fifth affirmative defense will be stricken because it is

legally deficient as currently worded; it asserts that the Government's "claims are barred"

-20-

because of inconsistency with the NCP.  This is problematic because "a defense that the government's response costs are inconsistent with the NCP is only a defense to the recoverability of particular response costs, but not to liability."  Kramer, 757 F. Supp. at 436.  Because this defect can easily be cured, Sensient is granted leave to amend this portion of the fifth affirmative defense.

The second part of the fifth affirmative defense is likewise defective.  It asserts that the Government's claim is barred with respect to costs that resulted from arbitrary and capricious action.  But "arbitrary and capricious" is not a separate basis for measuring the propriety of the EPA's response actions.  Instead, it is simply the statutory standard for judicial review of whether a response action is consistent with the NCP.  See 42 U.S.C. § 9613(j)(2) (explaining that a court should defer to the EPA's response action "unless the objecting party can demonstrate, on the administrative record, that the decision was arbitrary and capricious").  Thus, alleging the response action was arbitrary and capricious is no different from alleging inconsistency with the NCP.

According to the third clause of the fifth affirmative defense, this suit is barred because the response action was not supported by substantial evidence.  As one court observed, however, "the propriety of cleanup conduct [is] judged solely by the 'not inconsistent' standard of Section 107 . . . ."  United States v. Skipper, 781 F. Supp. 1106, 1112 (E.D.N.C. 1991).  Thus, an alleged lack of "substantial evidence" is not a defense in § 107(a) cases, either to liability or to the recoverability of particular response costs.

-21-

Finally, in the fourth part of the fifth affirmative defense, Sensient asserts the Government's claim is barred because the EPA "failed to meet all conditions precedent to recovery." The problem with this allegation is its complete lack of elaboration. Without identifying even generally the conditions precedent to which it refers, Sensient fails to provide adequate notice of the basis for the defense. See Robinson v. Johnson, 313 F.3d 128, 134-35 (3d Cir. 2002) (explaining that one reason Federal Rule 8(c) requires a defendant to plead an affirmative defense in the answer is to give the plaintiff "notice and the opportunity to demonstrate why the affirmative defense should not succeed"). For essentially this reason, at least one court has stricken an affirmative defense in a CERCLA case that similarly referred to the Government's failure to satisfy unspecified conditions precedent. See Pretty Products, Inc., 780 F. Supp. at 1498.

Alternatively, the Court concludes that the last portion of the fifth affirmative defense fails as a matter of law. "[T]here are no[] procedural prerequisites in CERCLA to commence a cost recovery action . . . ." Kelley, 714 F. Supp. at 1447. An affirmative defense that asserts the contrary is clearly inadequate.

For these reasons, the Court will grant the Government's motion to strike the fifth affirmative defense. As noted above, however, Sensient may amend the first portion of the defense, which relates to inconsistency with the NCP.

*6.  Sixth Affirmative Defense–Removal Versus Remedial Action*

According to the sixth affirmative defense,

> The United States may only conduct remedial work at sites
> listed on the National Priorities List, see 40 C.F.R. §
> 300.425(b)(1).  There is no dispute that the Site is not on the
> National Priorities List.  If the responsive activity at the Site is
> remedial, the United States is barred from recovering remedial
> costs from Sensient.

(Am. Answer, p. 10.)  The Government contends this defense fails as a matter of law

because it misrepresents the nature and purpose of the National Priorities List ("NPL").[9]

Sensient argues that it is merely challenging the recoverability of certain response costs

on the basis of inconsistency with the NCP.  The Court agrees with Sensient.

As noted, an EPA response action can take one of two forms–removal or

remediation.  "The distinction between removal and remedial actions is critical under

CERCLA because '[b]oth types of actions have substantial requirements, but the

requirements for remedial actions are much more detailed and onerous.'"  United States v.

Grace & Co., 429 F.3d 1224, 1228 (9th Cir. 2005) (quoting Morrison Enters. v.

McShares, Inc., 302 F.3d 1127, 1136 (10th Cir. 2002)).  For example, remedial actions

are eligible for Superfund financing only if the hazardous waste site at issue is listed on

the NPL.  See 40 C.F.R. § 300.425(b)(1).  Furthermore, the EPA must consider cost

factors when selecting appropriate remedial techniques, see id. § 300.430(f)(1)(ii)(D), but

---

[9]The NPL is "the list, compiled by EPA pursuant to CERCLA section 105, of
uncontrolled hazardous substance releases in the United States that are priorities for long-term
remedial evaluation and response."  40 C.F.R. § 300.5.

-23-

has no similar obligation with respect to the selection of removal actions, <u>Grace</u>, 429 F.3d at 1229.  Significantly, the various requirements for EPA response actions are prescribed by the NCP.  <u>See id.</u> at 1232 n.13.  And, again, a liable defendant can avoid reimbursing the Government for the costs of any response action that was inconsistent with the NCP. <u>See</u> 42 U.S.C. § 9607(a)(4)(A).

Here, the crux of the sixth affirmative defense seems to be that the Government mischaracterized its response at the Site as a removal action when, in fact, it was really a remedial action.  (<u>See</u> Hearing Tr., 7/17/08, 51:20-24.)  The Court understands the defense to assert that the Government cannot recover at least some of the costs associated with this alleged remedial action because it was inconsistent with the NCP's requirements for remediation.  So construed, this defense is legally cognizable.  <u>See</u> <u>Grace</u>, 429 F.3d at 1232 (analyzing whether the Government was prohibited from recovering certain costs where the defendant argued the EPA's characterization of its response as a removal action was incorrect and where the parties agreed that the response did not meet the NCP's requirements for remedial action).  It will not be stricken.

### 7. Seventh Affirmative Defense–Third-Party Defense

Sensient, in its seventh affirmative defense, attempts to assert a third-party defense to its liability.  (<u>See</u> Am. Answer, p. 11.)  But it fails to conform with the statutory requirements of § 107(b)(3) and the defense therefore is stricken.

Section 107(b)(3) provides a third-party defense that shields a defendant from

liability based on the "'complete absence of causation' by [the] defendant of the release or threatened release at the site." Kramer, 757 F. Supp. at 418 (citation omitted in original). The defense has three elements: 1) the release or threatened release was "caused solely by" an act or omission of an unrelated third party who was not an agent or employee of the defendant and with whom the defendant had no contractual relationship; 2) the defendant exercised due care as to the hazardous substance; and 3) the defendant took precautions against foreseeable third party acts or omissions, and against the foreseeable consequences of such acts or omissions. 42 U.S.C. § 9607(b)(3); see Kramer, 757 F. Supp. at 411; Rohm & Haas II, 939 F. Supp. at 1152. These requirements are strictly interpreted, and courts will strike defenses that fail to conform in any respect. Rohm & Haas II, 939 F. Supp. at 1152

Here, Sensient's third-party defense is deficient for two reasons. First, although it claims the release and resulting damages at the Site were caused by an unrelated third party, it fails to allege the third party was the *sole cause* of the damage. Such an allegation is essential to CERCLA's third-party defense. See Kelley, 714 F. Supp. at 1146 (striking a third-party defense that "merely allege[d] the third party 'in whole or in part' caused the harm" because "[t]he statute requires a showing that the third party was the sole cause").

Second, Sensient's third-party defense is deficient because it merely alleges Sensient "took precautions against foreseeable acts and omissions of such third party."

This is problematic because § 107(b)(3) requires a defendant to also establish he took precautions against "the consequences which could foreseeably result from such acts or omissions . . . ." 42 U.S.C. § 9607(b)(3).  Sensient makes no such allegation here and its third-party defense accordingly is stricken.  It is granted leave to properly amend this defense if it so chooses.

8.  *Eighth Affirmative Defense–Reduction in Liability Due to Settlement*

The eighth affirmative defense states that "in the event that it is found liable, Sensient is entitled to an offset or credit against such liability for any and all amounts actually paid, to be paid, or released, forgiven or otherwise covered by a settlement by or with any other person or entity . . . ."  (Am. Answer, p. 11.)  This defense is based on § 122(g)(5) of CERCLA, which provides

> A party who has resolved its liability to the United States under this subsection shall not be liable for claims for contribution regarding matters addressed in the settlement. Such settlement does not discharge any of the other potentially responsible parties unless its terms so provide, *but it reduces the potential liability of the others by the amount of the settlement.*

42 U.S.C. § 9622(g)(5) (emphasis added).  Sensient maintains that its eight affirmative defense merely puts the Government on notice of its intent to limit the Government's recovery by the amount of any settlement into which the Government enters with other entities.  (See Sensient's Br., p. 31.)  The Government argues that there is no reason to plead this as an affirmative defense because Sensient's right to a possible reduction in the extent of its liability speaks only to the amount of damages owed, and is preserved in

CERCLA itself.  (Hearing Tr., 7/17/08, 13:15-19; see Gov't Reply Br., p. 5-6.)

The Government may be correct in its contention that pleading such a defense is not necessary.  But it does not automatically follow that such a pleading is prohibited.  Common practice suggests it is not.  Cf. Smuggler-Durant Mining Corp., 823 F. Supp. at 877 (permitting the affirmative defense of inconsistency with the NCP, which is based on § 107(a)(4)(A) of CERCLA); Pretty Products, Inc., 780 F. Supp. at 1500 (same).

The Government alternatively contends that the eighth affirmative defense should be stricken because its language deviates from the language of § 122(g)(5).  The Court agrees.  This defense, as drafted, contains several terms, phrases, and concepts that have no basis in § 122(g)(5), including "offset," "credit," "against such liability," and "released, forgiven or otherwise covered."  While notice pleading does not often require technical perfection, there is ample authority indicating that statutory defenses in CERCLA cost recovery actions must be pleaded in conformity with the provisions on which they are based.  See, e.g., Rohm & Haas II, 939 F. Supp. at 1152 (noting that courts strictly interpret the statutory requirements in § 107(b)(3), and will strike a third-party defense that fails to conform in any respect).  Thus, the eighth affirmative defense is stricken, but Sensient is granted leave to amend it to conform with § 122(g)(5).

9.  *Ninth Affirmative Defense–No Recovery*
*for the Cleanup of Nonhazardous Materials*

The ninth affirmative defense asserts the "EPA is barred from recovering any costs that result from the cleanup of materials or constituents that are not 'hazardous

substances' as defined by CERCLA Section 101(14) . . . ."  (Am. Answer, p. 11.)
Sensient explained at oral argument that this defense is meant to test the propriety of the
EPA's chosen response action.  (Hearing Tr. 7/17/08, 56:10-15.)  For the reasons
discussed below, however, this defense fails as a matter of law.

Section 107(a)(4)(A) of CERCLA requires a liable defendant to pay "all costs of
removal or remedial action incurred by the United States Government . . . not inconsistent
with the national contingency plan . . . ."  42 U.S.C. § 9607(a)(4)(A).  Thus, the issue
raised by the ninth affirmative defense is really whether a response action can be rendered
inconsistent with the NCP simply because it involves the cleanup of nonhazardous
substances.

In United States v. Glidden Company, 3 F. Supp. 2d 823 (N.D. Ohio 1997), a
CERCLA defendant asserted it was not liable for the plaintiff's response costs in a §
107(a) recovery action because the costs were inconsistent with the NCP.  Id. at 835.  For
support, the defendant noted that the plaintiff incurred some of these costs in the process
of removing empty drums and an underground storage tank, neither of which contained
hazardous wastes.  Id. at 836.  According to the defendant, removing these items was
inconsistent with the NCP because they posed no threat to the public or environment,
making their removal an unnecessary and excessive clean-up act.  Id. The court rejected
this argument.  Analyzing the relevant regulatory language,[10] the court determined the

_____

[10]The relevant NCP language is found in 40 C.F.R. § 300.415, which requires the EPA to
consider the following factors in determining the appropriateness of a removal action:

-28-

NCP did not mention, much less prohibit, the removal of nonhazardous substances from a site.  <u>Id.</u> The defendant therefore failed to show the plaintiff's action was inconsistent with the NCP.[11]

_____

        (i) Actual or potential exposure to nearby human populations, animals, or the food chain from hazardous substances or pollutants or contaminants;

        (ii) Actual or potential contamination of drinking water supplies or sensitive ecosystems;

        (iii) Hazardous substances or pollutants or contaminants in drums, barrels, tanks, or other bulk storage containers, that may pose a threat of release;

        (iv) High levels of hazardous substances or pollutants or contaminants in soils largely at or near the surface, that may migrate;

        (v) Weather conditions that may cause hazardous substances or pollutants or contaminants to migrate or be released;

        (vi) Threat of fire or explosion;

        (vii) The availability of other appropriate federal or state response mechanisms to respond to the release; and

        (viii) Other situations or factors that may pose threats to public health or welfare of the United States or the environment.

40 C.F.R. § 300.415(b)(2).

    [11]Sensient argues the <u>Glidden</u> court's decision was also based on its finding that the defendant had not sufficiently shown that the challenged removal costs were excessive.  Sensient contends it, like the <u>Glidden</u> defendant, should at least have an opportunity to demonstrate the Government's removal costs were excessive.  But Sensient misunderstands the <u>Glidden</u> court's disposition of the challenge to the plaintiff's costs.  In evaluating this challenge, the court noted the defendant could prevail only if it demonstrated 1) that the action taken was inconsistent with the NCP and 2) that, as a result of this inconsistency, the plaintiff's costs were excessive.  <u>See</u> 3 F. Supp. 2d at 835.  The court based its rejection of the challenge primarily on its determination

This Court agrees with the <u>Glidden</u> court's analysis.  Nothing in the NCP suggests the EPA, during its response action, may not remove from a site nonhazardous substances.  And even if the response action here was remedial in nature, as alleged in the sixth affirmative defense, the NCP rules pertaining to the selection of remedial activity similarly do not mention, much less prohibit, the cleanup of nonhazardous substances.  <u>See</u> 40 C.F.R. §§ 300.430(f)(1)(i); 300.430(e)(9)(iii).[12]  Therefore, the defense is stricken.

   *10.  Tenth Affirmative Defense–Time and Cost Limitations for Response Action*

   Sensient, in its tenth affirmative defense, notes the Government's allegation that its removal action at the Site spanned eight years and cost sixteen million dollars.  The defense asserts that the Government may not recover costs exceeding two million dollars or relating to action that lasted more than twelve months.  This defense is based on §

_____

that the removal of nonhazardous substances was not inconsistent with the NCP.  <u>See id.</u> at 836. The court added, however, that even if the removal was inconsistent with the NCP, the defendant would still not have prevailed because it had not shown the costs to be excessive.  <u>Id.</u> at 836-37. Thus, Sensient's interpretation of <u>Glidden</u> ignores the fact that the court supported its conclusion with two alternative reasons, either of which was independently sufficient to defeat the defendant's argument.  As such, Sensient's attempt to limit <u>Glidden</u> is unpersuasive.

   [12]Section 300.430(f)(1)(i) requires the EPA to select an appropriate remedy based on several factors listed in § 300.430(e)(9)(iii).  These factors include:  A) the remedy's overall protection of human health and the environment; B) the remedy's compliance with federal environmental laws and state environmental or facility siting laws; C) the long-term effectiveness and permanence of the remedy; D) the degree to which the remedy reduces toxicity, mobility, or volume of hazardous substances through treatment; E) the short-term effectiveness of the remedy; F) the ease or difficulty of implementing the remedy; G) the remedy's costs; H) state acceptance of the remedy; and I) community acceptance of the remedy.

104(c)(1) of CERCLA, which, subject to certain enumerated exceptions,[13] prohibits

additional obligations from the Superfund "after $ 2,000,000 has been obligated for

response actions or 12 months has elapsed from the date of initial response to a release or

threatened release of hazardous substances."  42 U.S.C. § 9604(c)(1).  These time and

cost limitations also appear in the NCP, which states, "CERCLA fund-financed removal

actions . . . shall be terminated after $ 2 million has been obligated for the action or 12

months have elapsed from the date that removal activities begin on-site" unless an

exception applies.  40 C.F.R. § 300.415(b)(5).

    These time and costs limitations do not affect the existence or non-existence of a

CERCLA defendant's liability because § 107(a) expressly provides for liability

---

[13]The limitations embodied in § 104(c)(1) will not apply if:

    (A) the President finds that

        (i) continued response actions are immediately required to
        prevent, limit, or mitigate an emergency,
        (ii) there is an immediate risk to public health or welfare or
        the environment, and
        (iii) such assistance will not otherwise be provided on a
        timely basis, or

    (B) the President has determined the appropriate remedial actions
    pursuant to paragraph (2) of this subsection and the State or States in
    which the source of the release is located have complied with the
    requirements of paragraph (3) of this subsection, or

    (C) continued response action is otherwise appropriate and consistent
    with the remedial action to be taken obligations from the Fund . . . .

42 U.S.C. § 9604(c)(1).

"[n]otwithstanding any other provision or rule of law . . . ."  42 U.S.C. § 9607(a); <u>see also</u>

<u>Rohm & Haas II</u>, 939 F. Supp. at 1153 ("[T]he liability provisions of section 107(a) are

independent of requirements in other provisions in CERCLA.").  But parties liable under

§ 107(a) need not reimburse the Government for the costs of a response action that was

inconsistent with the NCP.  <u>See</u> 42 U.S.C. § 9607(a)(4)(A).  To establish inconsistency, a

CERCLA defendant "must show the EPA acted arbitrarily and capriciously in choosing

the response action."  <u>Dupont</u>, 432 F.3d at 179.  The time and cost limitations in §

104(c)(1) and the NCP speak to the nature of the chosen response action.  The tenth

affirmative defense therefore presents a viable challenge to the recoverability of particular

costs on the basis of alleged inconsistency with the NCP.  It will not be stricken.[14]

### 11.  *Eleventh Affirmative Defense–Due Process*

The eleventh affirmative defense alleges the "EPA is barred from recovering its

response costs . . . pursuant to the Due Process Clause of the Fifth Amendment since,

*inter alia*, Sensient was not provided with contemporaneous notice of the United States'

eight years of alleged activities at the Site or an opportunity to participate in the

development of the administrative record."  (Am. Answer, p. 12.)  According to Sensient,

this defense raises a procedural due process challenge to the Government's alleged failure

"to comply with CERCLA's procedural safeguards regarding notice and participation in

---

[14]Notably, the Government concedes that the tenth affirmative defense is not defective to the extent it merely challenges the recoverability of particular response costs.  (Gov't Reply Br., p. 29.)

the administrative process." (Sensient Br., p. 33.) The Government argues this defense is defective as a matter of law. Resolution of these arguments requires an analysis of the decisions in Rohm & Haas I, 669 F. Supp. 672 and Kramer, 757 F. Supp. 397.

Rohm & Haas I concerned the appropriate standard of review for determining whether EPA's chosen remedial action at a hazardous waste site was inconsistent with the NCP. 669 F. Supp. at 675. The plaintiff asserted that review was limited to whether the action was "arbitrary, capricious, or otherwise not in accordance with the law" based on the existing administrative record. Id. The defendants contended that application of this standard would violate their due process rights, particularly because they were not afforded an adequate opportunity to challenge the chosen remedy at the administrative level. Id. at 677. Instead, the defendants asserted that they were entitled to a full *de novo* review of the agency action in the district court. Id. In support of their argument, the defendants noted that CERCLA mandated the promulgation of hearing procedures before the EPA to enable potentially responsible parties ("PRPs") to participate in the selection of an appropriate response action and in the development of the administrative record. Id. (citing 42 U.S.C. § 9613(k)). According to the defendants, however, they were not given an opportunity to present evidence to the EPA or to help develop the administrative record. Id. at 678.

In analyzing these arguments, the court first noted that CERCLA contemplates a limited paper hearing before the EPA, and prohibits an adjudicatory hearing. Id. at 679

(citing 42 U.S.C. § 9613(k)(2)(C)).  It also requires, for remedial actions, notice to

potentially affected persons, an opportunity to comment on the proposed action, a public

meeting, an EPA response to comments and criticisms, and an explanation of the remedy

selected.  Id. at 682 (citing 42 U.S.C. § 9613(k)(2)(B)).  The court held that a paper

hearing and the aforementioned protections would satisfy due process because they

allowed PRPs, who have important financial interests at stake, an opportunity to weigh in

the on selection of the remedy without the negative impacts associated with "long, drawn-

out, and costly trial-type procedures . . . ."  Id. at 680.  But the court expressed concerns

over the process that was actually afforded to the defendants at the administrative level.

Specifically, they did not receive notice of the remedy selected and were given an

unreasonably short period of time to submit their comments.  Id. at 682-83.  Moreover,

the administrative record was incomplete in that it did not contain any of the defendants'

comments or a report submitted by a particular defendant's consultant.  Id. at 683.  As a

result, the court could not confine its review of the selected response action to the

administrative record as it then existed.  Id.  It therefore remanded the case to the EPA for

further development of the record.  Id. at 683-84.

In Kramer, the EPA allegedly failed to inform a particular defendant, Morton, that

it was a PRP until after the response action had already been selected.  See 757 F. Supp.

at 431.  Morton asserted in an affirmative defense that this lack of notice violated its due

process rights because it was prevented from "commenting upon or participating in the

selection of the remedial action" at the site.  Id. at 431-32.  When the plaintiff moved to strike this defense, Morton pointed to the Rohm & Haas I decision, under which it contended it had the right to supplement the administrative record.  Id. at 432.  The court, however, ordered the defense stricken.  It noted that Rohm & Haas I concerned only the standard of review for the EPA's choice of a response action, and not the issue of the defendants' liability.  Id. (citing Rohm & Haas I, 669 F. Supp. at 675).  Moreover, the court observed that Rohm & Haas I quoted extensively from § 113(k) of CERCLA, including a provision mandating that the failure to provide notice to a PRP was not a defense to liability.  Id. (citing 42 U.S.C. § 9613(k)(2)(D)).  Unlike in Rohm & Haas I, however, Morton raised the issue of inadequate notice as a defense to liability.  Id. According to the Kramer court, neither Rohm & Haas I nor the plain language of § 113(k) permitted such a defense.  Id.  Instead, the court determined that "'[b]ecause the liability of any PRP under Section 107(a) is determined by an appropriate federal court, such parties are receiving notice and an opportunity to be heard as required by the strictures of procedural due process.'"  Id. (quoting United States v. Shaner, Civil No. 85-1372, 1990 U.S. Dist. LEXIS 6893, at *31 n.16 (E.D. Pa. June 5, 1990)).

The Government contends this case is controlled by Kramer, and that Sensient will receive due process insomuch as its liability will be determined by this Court.  (Hearing Tr., 7/17/08, 40:3-7; see Gov't Reply Br., p. 32.)  This misses an important point.  Unlike

in <u>Kramer</u>, Sensient does not raise its due process challenge as a defense to liability[15];
instead, it asserts "that the failure of the United States to comply with CERCLA's notice
provisions for notice to [PRPs] and participation in the development of the administrative
record should limit the extent of the United States' recovery." (Sensient's Br., p. 36.)  In
essence, Sensient is saying that it wishes to challenge the chosen response action as being
inconsistent with the NCP, a process that necessitates a deferential review of the
administrative record.  <u>See</u> 42 U.S.C. § 9613(j)(2).  But, Sensient contends it was not
given an adequate chance to participate in the development of that record, which, it
claims, violates its due process rights and would unfairly skew judicial review of the
selected response.  Based on <u>Rohm & Haas I</u>, the Court cannot conclude at this juncture
that the substance of the eleventh affirmative defense is clearly inadequate.

Nonetheless, the Court will strike the defense because it cryptically uses the phrase
"*inter alia*."  This phrase implies that there are additional, but unstated, bases for the
defense.  This deprives the Government of meaningful notice of all the arguments
Sensient intends to raise.  <u>See</u> <u>Robinson</u>, 313 F.3d at 134-35 (explaining that one reason
for Rule 8's notice requirement is to give the plaintiff "notice and the opportunity to
demonstrate why the affirmative defense should not succeed").  It is therefore stricken,
but the Court grants Sensient leave to amend this defense either by omitting the phrase

---

[15]The Court disagrees with the Government's argument that the eleventh affirmative
defense is effectively a defense to liability.  The defense's wording relates only to the recovery of
the Government's costs.  Moreover, Sensient readily concedes that this defense merely goes to
the extent of its damages, not the existence of its liability.  (<u>E.g.</u>, Sensient's Br., p. 36.)

"*inter alia*," or by fully stating its reasons for asserting the defense.

### 12.   Twelfth Affirmative Defense–Defects in the Administrative Record

The twelfth affirmative defense presents something of a corollary to the eleventh

affirmative defense.  It alleges that the "EPA is barred from recovering its response costs .

. . since, *inter alia*, the administrative record developed by EPA: (a) fails to adequately

support the response actions chosen by EPA; (b) fails to explain EPA's actions; (c) is

incomplete; and (d) demonstrates that EPA failed to consider all relevant factors."  (Am.

Answer, p. 12.)  Sensient notes in its brief that the NCP sets forth the requirements for the

establishment and content of the EPA's administrative record.  (Sensient's Br., p. 12

(citing 40 C.F.R. §§ 300.800-300.825).)  It argues the twelfth affirmative defense

therefore alleges an additional inconsistency with the NCP which, if proved, would

permit it to avoid reimbursement of at least some response costs.

Parties liable under § 107(a) must pay "all costs of removal or remedial action

incurred by the United States Government . . . not inconsistent with the national

contingency plan . . . ."  42 U.S.C. § 9607(a)(4)(A).  "To establish an EPA response

action is inconsistent with the National Contingency Plan, a responsible party must show

the EPA acted arbitrarily and capriciously in choosing the response action."  Dupont, 432

F.3d at 178-79 (emphasis added) (citations omitted).

The Government contends the twelfth affirmative defense should be stricken

because the adequacy of administrative record is irrelevant to whether the EPA was

arbitrary in its choice of response actions.  But the administrative record serves as the basis for the selection of the response action.  See 42 U.S.C. § 9613(k)(1).  It follows that the EPA could have acted arbitrarily and capriciously in selecting its response if and to the extent the selection was based on a seriously defective administrative record.  At the very least, the substance of this defense passes muster at the pleading stage.

What does not pass muster, however, is Sensient's usage of the phrase "*inter alia*." As with the eleventh affirmative defense, the phrase's appearance here suggests there are additional, but unstated, bases for the twelfth defense.  As a result, Sensient has not given the Government notice of the grounds for the defense, which violates Rule 8.  The twelfth affirmative defense is therefore stricken, but Sensient is granted leave to amend it, either by omitting the phrase "*inter alia*," or by fully stating its reasons for asserting the defense.

### 13.  General Reservation of Future Defenses

In addition to asserting the foregoing defenses, Sensient's Answer also "reserves the right to assert additional defenses and affirmative defenses as discovery and/or further investigation may warrant."  (Am. Answer, p. 13.)  The Government contends this general reservation contravenes the Federal Rules of Civil Procedure.  It is correct.

The Federal Rules generally require a defendant to plead its affirmative defenses in its answer.  See FED. R. CIV. P. 8(c).  One reason for this requirement is to give the plaintiff "notice and the opportunity to demonstrate why the affirmative defense should not succeed."  Robinson, 313 F.3d at 134-35.  But a general reservation does not actually

assert a defense.  Instead, it merely indicates a defendant's possible intention to assert a defense in the future.  As such, it injects only ambiguity into the pleadings and therefore violates Rule 8's notice requirement.  See Messick v. Patrol Helicopters, Inc., Civil No. 07-039, 2007 U.S. Dist. LEXIS 63839, at *11 (D. Mont. Aug. 27, 2007); Boss Prods. Corp. v. Tapco Int'l Corp., Civil No. 00-0689, 2001 U.S. Dist. LEXIS 1509, at *8 (W.D.N.Y. Feb. 16, 2001).  For this reason, Sensient's reservation is stricken.  If it desires to raise additional defenses, it must follow the procedures identified in Rule 15.

## IV.  CONCLUSION

For the foregoing reasons, the Government's motion to strike is granted in part and denied in part.  Each of the twelve affirmative defenses is stricken, with the exceptions of the sixth and tenth defenses.  The general reservation of future defenses is also stricken. Leave to amend the first, third, fifth (but only as to the first clause therein), seventh, eighth, eleventh, and twelfth affirmative defenses is granted.  An appropriate Order accompanies this Opinion.


 /s/ Joseph H. Rodriguez
JOSEPH H. RODRIGUEZ
United States District Judge



Dated: August 12, 2008

-39-